1   **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9   REYNALDO GUERRA JIMENEZ, *et al.*,        )   No. CV-07-01492-PHX-GMS
                                              )   No. CV-07-02581-PHX-GMS
10              Plaintiffs,                    )
                                              )   (Consolidated)
11  vs.                                        )
                                              )
12  SERVICIOS AGRICOLAS MEX, INC., *et al.*   )   **ORDER**
                                              )
13              Defendants.                    )
                                              )
14  _____       )
15  JUAN ABARCA FIGUEROA, *et al.*,           )
                                              )
16              Plaintiffs,                    )
                                              )
17  vs.                                        )
                                              )
18  SERVICIOS AGRICOLAS MEX, INC., *et al.*   )
                                              )
19              Defendants.                    )
                                              )
20  _____       )

21          Two motions for summary judgment are pending before the Court: one filed by

22  Defendants, (Doc. 179), and one filed by Plaintiffs, (Doc. 181).  For the following reasons,

23  the Court denies Defendants' motion and grants Plaintiffs' motion in part and denies it in

24  part.

25                                **BACKGROUND**

26          This case results from the consolidation of two matters, each with multiple Plaintiffs.

27  In total, Plaintiffs are a group of United States citizens or legal permanent residents who

28  allegedly worked picking lemons for Defendants Marlin Ranching, Inc. ("Marlin Ranching"),

Marlin Growers, Inc. ("Marlin Growers"), Servicios Agricola Mexicano ("SAMCO"), Servicios Agricolas Mex Inc. ("SAMI"), Richard De Leon, and Ralph De Leon.  Plaintiffs allege that they worked for the Defendants in two relevant growing seasons, 2004–05 and 2005–06.

Defendants are several corporations and individuals that Plaintiffs allege work together as one joint employer.  Specifically, Marlin Ranching is an Arizona corporation that farms citrus and owns or leases land on which Plaintiffs picked the lemons.  Marlin Ranching also would determine the dates and times when workers would be allowed to pick lemons.  Marlin Growers is a cooperative of citrus growers that received and paid the invoices for the labor Plaintiffs performed.  SAMCO was a now-dissolved California farm-labor contracting corporation.  SAMCO provided citrus harvesting and pruning services in California and Arizona.  SAMI is an Arizona farm-labor contracting corporation that allegedly provided labor contracting services to the Marlin entities.  Ralph De Leon was the president of SAMCO and allegedly exercised operational and day-to-day control over SAMCO.  Richard De Leon is Ralph De Leon's son and is a shareholder and president of SAMI.  Richard De Leon allegedly had control over SAMI's overall business and day-to-day operations.  At the same time he managed SAMI, he was employed by SAMCO, but the parties dispute the extent of that employment relationship.  During the two relevant seasons, Plaintiffs were on the payroll of SAMCO and/or SAMI.  While working on the payroll of SAMCO and/or SAMI, Plaintiffs allegedly picked lemons on behalf of the Marlin entities in and around Yuma County, Arizona and Imperial County, California.

Plaintiffs contend that they were required to wait at various times and places to be given permission to start picking lemons.  Lemons may be picked only under certain weather conditions.  Therefore, farmers must measure the humidity in the air before commencing harvesting.  Plaintiffs allege that the unpredictable conditions caused them to have to wait to begin work, even though their work days arguably had begun.  Specifically, Plaintiffs raise four scenarios in which they frequently had to wait, but were not compensated.

First, they allegedly waited at the "corralon," which was the bus stop where many Plaintiffs waited for a company bus to take them to the fields for work. Although taking the bus was optional, Defendants apparently strongly encouraged Plaintiffs to take the bus to the fields and required those workers choosing to take the bus to arrive at the bus stop by a particular time each morning. Plaintiffs then would wait for the bus to arrive; the bus would sometimes arrive at the announced time, but it would arrive late on days when the lemons were not ready to be picked in the early morning. Plaintiffs could engage in various personal activities while waiting for the bus, but, as a practical matter, were limited in the distance they could travel from the corralon for fear that the bus would arrive and leave without them. Similarly, Plaintiffs contend they would sometimes arrive at the fields, only to be informed that the lemons were not ready for picking. On those days, Plaintiffs allegedly were forced to wait at the fields until picking was allowed. In addition to the time spent waiting at the fields and in the corralon, Plaintiffs assert that they were not fully compensated for time spent traveling on the bus from the corralon to the fields in Arizona and California and that they were not compensated for time allegedly spent traveling from one field to another field during the work day. Plaintiffs further offer evidence that Defendants did not accurately record this waiting and travel time.

Aside from Defendants' alleged failures to record and compensate certain time, one group of U.S.-citizen Plaintiffs alleges that Defendants refused to rehire them based on their status as U.S. citizens. Until the 2006–07 harvest, Defendants' practice was to recruit and rehire its U.S. workforce from previous seasons. On June 19, 2006, however, Defendants filed an application to import one hundred and fifty temporary foreign workers for the 2006–07 harvest. On this application, Defendants represented that they would independently contact potential qualified workers by letter and/or telephone. Contrary to U.S. Department of Labor instructions, however, Defendants made no attempt by telephone, in-person solicitation, or correspondence, to solicit the return of its U.S. workforce as it had done in previous seasons. Ultimately, Defendants did not rehire this group of U.S.-citizen Plaintiffs for the 2006–07 season, but instead hired immigrant H-2A workers.

1    Plaintiffs filed the two now-consolidated actions.  The *Jimenez* Plaintiffs allege four

2    claims: (1) violation of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), (2)

3    violation of the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. § 1801

4    *et seq.* ("AWPA"), (3) breach of contract, and (4) violation of California labor laws and

5    regulations.  The *Figueroa* Plaintiffs raise two claims: (1) violation of AWPA, and (2)

6    discrimination based on alienage/citizenship under 42 U.S.C. § 1981.  Plaintiffs move for

7    summary judgment on claims based on the FLSA, AWPA, breach of employment contract,

8    and California wage laws.  Defendants, meanwhile, move for summary judgment on the

9    discrimination claim brought under 42 U.S.C. § 1981.

10                                    **LEGAL STANDARD**

11    Summary judgment is appropriate against a party who "fails to make a showing

12    sufficient to establish the existence of an element essential to that party's case, and on which

13    that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

14    (1986).  The Court should grant summary judgment only if the evidence, viewed in the light

15    most favorable to the nonmoving party, shows "that there is no genuine issue as to any

16    material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

17    56(c).  Substantive law determines which facts are material, and "[o]nly disputes over facts

18    that might affect the outcome of the suit under the governing law will properly preclude the

19    entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986);

20    *see Jesinger v. Nev. Fed. Credit Union*, 24 F.3d 1127, 1130 (9th Cir. 1994).  The moving

21    party "bears the initial responsibility of informing the district court of the basis for its motion,

22    and identifying those portions of [the record] which it believes demonstrate the absence of

23    a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  Then, the burden is on the

24    nonmoving party to establish a genuine issue of material fact. *Id.* at 322–23. The nonmoving

25    party "may not rely merely on allegations or denials in its own pleading; rather, its response

26    must—by affidavits or as otherwise provided in this rule—set out specific facts showing a

27    genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see Matsushita Elec. Indus. Co. v. Zenith*

28    *Radio Corp.*, 475 U.S. 574, 586–87 (1986).  Such "supporting or opposing affidavit[s] must

be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e)(1). Finally, because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, . . . [t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his [or her] favor" at the summary judgment stage. *Anderson*, 477 U.S. at 248.

**DISCUSSION**

Defendants move for summary judgment on Plaintiffs' claim under 42 U.S.C. § 1981. In their Motion, Plaintiffs move for summary judgment on the following issues: (1) that Defendants SAMI, SAMCO, Marlin Ranching, Marlin Growers, Ralph De Leon, and Richard De Leon were joint employers of Plaintiffs; (2) that Defendants are liable under the Fair Labor Standards Act ("FLSA") for failure to compensate Plaintiffs for the time spent waiting in parking lots and fields; (3) that Defendants are liable under the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA") for failure to pay wages due, for violation of the working arrangement, and for record-keeping violations; and (4) that Defendants are liable under California labor laws and regulations for failure to pay wages due for labor performed by Plaintiffs in California.

**II.    ANALYSIS**

**A.    United States Citizens May Bring a Section 1981 Claim for Discrimination on the Basis of Citizenship.**

The parties dispute whether Plaintiffs may bring a cause of action under 42 U.S.C. § 1981 for discrimination based on their status as U.S. citizens.  Plaintiffs assert that Defendants refused to rehire them as farm workers for the 2006–07 seasons and that Defendants instead made various misrepresentations to the U.S. Department of Labor in order to hire immigrant H-2A workers.  In the present context, Plaintiffs adequately allege that this constitutes discrimination prohibited by 42 U.S.C. § 1981 provides,  "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence and to the full and

1   equal benefit of all laws and proceedings for the security of persons and property as is

2   enjoyed by white citizens." 42 U.S.C. § 1981(a). Contrary to Defendants' assertion, the

3   plain text of Section 1981 applies to "[a]ll persons," which necessarily includes both citizens

4   and non-citizens. 42 U.S.C. § 1981(a); *see also Graham v. Richardson*, 403 U.S. 365, 375

5   (1971) (explaining in the context of Section 1981 that "an alien as well as a citizen is a

6   'person' for equal protection purposes"); *Sagana v. Tenorio*, 384 F.3d 731, 738 (9th Cir.

7   2004) ("'The protection of this statute has been held to extend to aliens as well as to

8   citizens.'") (quoting *Takahashi v. Fish and Game Comm'n*, 334 U.S. 410, 419 (1948)).

9          Defendants' Motion focuses largely on the scope of "alienage" discrimination under

10  Section 1981, asserting that U.S. citizens cannot bring claims based on alienage

11  discrimination because, by definition, Plaintiffs are not aliens. Nevertheless, § 1981 provides

12  to all persons "the same right in every State and Territory to make and enforce contracts."

13  No where does it use the term "alien" to describe those to whom it extends protection. And

14  to the extent that Defendants have extended a hiring preference to non-citizens they have

15  engaged in a violation of the statute's plain terms by giving non-American citizens hiring

16  preference over Americans. When the statute requires that all persons shall have the same

17  right to make and enforce contracts . . . as enjoyed by white citizens."

18  Thus, when the Plaintiffs allege that Defendants extended employment uniquely to non-

19  citizens of the United States, they allege that, as citizens of the United States, they were

20  deprived of the same right to contract as was extended to non-citizens. Such conduct falls

21  squarely within the express prohibitions of § 1981.

22         The Supreme Court has stated in the context of race-based discrimination under

23  Section 1981. In *McDonald v. Santa Fe Trail Transp. Co.,* white plaintiffs were allegedly

24  discriminated against by their employer on the basis of race. 427 U.S. 273, 274 (1976). The

25  plaintiffs brought a claim under Section 1981, but the district court dismissed the complaint,

26  concluding that the language "as is enjoyed by white citizens" rendered Section 1981

27  applicable only to non-white plaintiffs. *Id*. The Supreme Court reversed, holding that the

28  plain language of Section 1981 protects "*all* persons" from discrimination. *Id*. at 285

1    (emphasis added).  As *McDonald* concluded that the plain language of Section 1981 prohibits

2    discrimination against persons of all races, and not only non-whites, it is axiomatic that,

3    Section 1981 prohibits discrimination against persons of all citizenships and not only non-

4    Americans.

5          Several other courts have followed this approach.  In *Thomas v. Rohner-Gehrig &*

6    *Co.*, plaintiffs, who were Americans working for a Swiss company, were discharged and

7    replaced by Swiss and Germans. 582 F. Supp. 669, 671 (N.D. Ill. 1984).  Plaintiffs brought

8    a claim under Section 1981 for discrimination based on national origin. *Id*. at 671.  Although

9    the court dismissed the claim on other grounds, it allowed plaintiffs to amend their complaint

10   to state a claim under Section 1981 because American citizens may be able to allege

11   citizenship discrimination under that statute. *Id*. at 672–73. The Court explained:

12         Plaintiff's complaint does not allege that plaintiffs were American citizens, or
           that their replacements were not American citizens. Were that in fact the case,
13         and if Section 1981 does prohibit alienage discrimination, we could have a
           situation amounting to reverse alienage discrimination, and redress might be
14         available under Section 1981.  Thus, we believe the appropriate action with
           regard to plaintiffs' Section 1981 claim is to dismiss with leave to amend.

15

16   *Id*. at 673; *see also United States v. Richard Dattner Architects,* 972 F. Supp. 738, 747–48

17   (S.D.N.Y. 1997) (recognizing the possibility that an American citizen may allege citizenship

18   discrimination under Section 1981).

19         The cases cited by Defendants are unpersuasive, because like Defendants they base

20   their analysis on the word "alienage" which is nowhere in the statute.  For example, *Chaiffetz*

21   *v. Robertson Research Holding,* stated, "[D]iscrimination against whites is racial

22   discrimination, but (in America) discrimination against Americans can never be

23   discrimination based on alienage.  It can only be discrimination based on national origin . .

24   . relief under Section 1981[] is unavailable." 798 F.2d 731, 735 (5th Cir. 1986).  The Eastern

25   District of New York recently followed this logic, asserting that Section 1981 "appl[ies] to

26   discrimination on the basis of alienage, i.e. non-U.S. citizenship." *Vaughn v. City of N.Y.*,

27   2010 WL 2076926, at *10 (E.D.N.Y. May 24, 2010).  Both *Chaifetz* and *Vaughn* reasoned

28   that the term "alienage," according to its dictionary definition, could apply only to non-U.S.

1 citizens. *Chaiffetz,* 798 F.2d at 735; *Vaughn*, 2010 WL 2076926, at *10. While it may be
2 true that an "alien" is a citizen of another country, Section 1981 does not include the term
3 "alien." 42 U.S.C. § 1981.[1]  Rather, it applies to "all persons."

4        As is already explained, Section 1981's plain text, as well as Supreme Court and
5 Ninth Circuit precedent hold that Section 1981 (1) protects "all persons" against
6 discrimination, (2) applies to U.S. citizens, and (3) protects against so-called "reverse
7 discrimination." *McDonald*, 427 U.S. at 285; *Takahashi*, 334 U.S. at 419; *Sagana,* 384 F.3d
8 at 738.  Therefore, it does not follow that Americans would be unprotected from this type of
9 discrimination, where non-citizens would be afforded this relief.

10       Plaintiffs have presented evidence that Defendants refused to rehire them, and instead
11 hired non-citizen immigrant workers instead.  In other words, Defendants deprived Plaintiffs
12 of an equal right to contract as was enjoyed by others, and Defendants engaged in such
13 discrimination against the Plaintiffs based on their citizenship status.  This falls squarely
14 within the prohibition of Section 1981.  Thus, Defendants' motion on this issue is denied.

15       **B.    Private Alienage Discrimination is Proscribed under Section 1981**

16       The Civil Rights Act of 1991 amended Section 1981 to add sections (b) and (c).
17 Section (c) provides, "The rights protected by this section are protected against impairment
18 by nongovernmental discrimination and impairment under color of State law." 42 U.S.C.
19 § 1981(c).  In other words, the rights protected in Section 1981(a) apply to both public and
20 private discrimination. *See Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 254 (1992) ("When
21 the words of a statute are unambiguous, . . . 'judicial inquiry is complete.'").

---

23       [1]Not only does Section 1981's text not include the term "alien," courts recognizing
24 discrimination against non-citizens have used the terms "alienage" and "citizenship"
   interchangeably. *See, e.g.*, *Martinez v. Partch*, 2008 WL 113907, at *2 (D. Colo. Jan. 9,
25 2008) (using "citizenship discrimination" and "alienage discrimination" interchangeably);
   *Chacko v. Tex. A&M Univ.*, 960 F. Supp. 1180, 1191 (S.D. Tex. 1997) ("Accordingly,
26 section 1981 must be construed to prohibit private discrimination on the basis of
   citizenship."); *Cheung v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 913 F. Supp. 248, 251
27 (S.D.N.Y. 1996) ("The Supreme Court has held that section 1981 also prohibits states from
28 enacting laws which discriminate on the basis of citizenship.") (internal citation omitted).

1       Defendants make no argument that this statute is unconstitutional.  The analysis in

2   *Bhandari* is distinguishable, as that case was decided prior to the 1991 enactment of Section

3   (c).

4       Courts interpreting the amended Section (c) have found that it applies to private

5   conduct.  In *Anderson*, the issue on appeal was whether the appellees violated Section 1981

6   by discharging a union member because he was not a citizen of the United States. 156 F.3d

7   at 176.  The Second Circuit explained, "[t]he 1991 amendment to Section 1981. . . makes

8   clear that the rights enumerated in section 1981(a) are protected from private as well as

9   governmental discrimination." *Id.* at 176.  In *Chacko*, addressing the same issue, the court

10  noted, "Although questions may have existed previously about whether Section 1981's

11  protections against alienage discrimination extend to both public and private actors, the 1991

12  amendments to Section 1981 make clear that '[t]he rights protected by this section are

13  protected against impairment by nongovernmental discrimination.'" 149 F. Supp. at 1191

14  (quoting 42 U.S.C. § 1981(c)); *see also Martinez*, 2008 WL 113907, at *2 n. 5 ("[T]he post-

15  1991 language of the statute clearly extends the reach of section 1981 to both private and

16  governmental action . . . ."); *Zhang v. Ma Labs, Inc.*,  2005 WL 889724, at *2 (N.D. Cal.

17  Apr. 15, 2005) (applying the 1991 amendment and concluding that Section 1981

18  encompasses private discrimination based on alienage).[2]

19  **II.     Joint Employment**

20      The parties agree on the Ninth Circuit law governing joint employment relationships.

21  Whether an entity is a joint employer under FLSA and AWPA is a question of law. *Torres-*

22  *Lopez v. May*, 111 F.3d 633, 638 (9th Cir. 1997).  The test for both statutes is the same. *See*

23  *id.* at 639 (""'[J]oint employment' under the [FLSA] is 'joint employment' under the

24  [AWPA].'") (quoting 29 C.F.R. § 500.20(h)).  Both the FLSA and AWPA "broadly" define

25  

26      [2] Likewise, in *Duane v. Geico*, the court did not analyze the 1991 amendment, but

27  nonetheless concluded that Section 1981 bars private discrimination against aliens. 37 F.3d
at 1041.  The court based its holding on the history and legislative purpose of the statute,

28  which was intended to protect against both public and private discrimination. *Id.* at 1039–44.

the employer-employee relationship. *Torres-Lopez*, 111 F.3d at 638–39.  Under both statutes, to "employ" means merely "'to suffer or permit to work.'" *Id.* (quoting 29 U.S.C. § 203(g)). Under this broad standard, to determine whether a joint employment relationship exists, the Ninth Circuit applies an "economic reality" test. *Id.* at 639.  This test examines the totality of the circumstances and the economic reality of the situation, considering a non-exhaustive list of factors. *Moreau v. Air Fr.*, 356 F.3d 942, 946–48 (9th Cir. 2004).  These factors include: (1) "[t]he nature and degree of control of the workers;" (2) "[t]he degree of supervision, direct or indirect, of the work;" (3) "[t]he power to determine the pay rates or the methods of payment of the workers;" (4) "[t]he right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers;" (5) "[p]reparation of payroll and the payment of wages[;]" (6) "whether the work was a specialty job on the production line;" (7) "whether responsibility under the contracts between a labor contractor and an employer pass from one labor contractor to another without material changes;" (8) "whether the premises and equipment of the employer are used for the work;" (9) "whether the employees had a business organization that could or did shift as a unit from one worksite to another;" (10) "whether the work was piecework and not work that required initiative, judgment or foresight;" (11) "whether the employee had an opportunity for profit or loss depending upon the alleged employee's managerial skill;" (12) "whether there was permanence in the working relationship;" and (13) "whether the service rendered is an integral part of the alleged employer's business." *Id.* (citing 29 C.F.R. § 500.20(h); *Torres-Lopez*, 111 F.3d at 639).

Defendants do not dispute that Marlin Growers, Marlin Ranching, SAMI, and Richard De Leon, as president of SAMI, were all joint employers.  Defendants contend, however, that SAMCO, and presumably its president, Ralph De Leon, were not joint employers with these other entities and individuals.  While the parties agree that Defendants hired H-2A workers, Defendants explain that SAMCO did not hire *any* of the Plaintiffs to work for Marlin Growers or Marlin Ranching during the two relevant growing seasons.  Construing the facts

1   in Defendants' favor, by definition, SAMCO could not have been a joint employer of

2   Plaintiffs if it did not hire any Plaintiffs during the relevant growing seasons.

3          Plaintiffs assert in their Reply Brief that SAMCO has failed to present admissible

4   evidence of these facts.  But Plaintiffs, not Defendants, are the summary-judgment movants

5   and the ones with the ultimate burden of proof on this issue.  Thus, Plaintiffs' must "make

6   a showing sufficient to establish the existence of an element essential to that party's case, and

7   on which that party will bear the burden of proof at trial."   *Celotex*, 477 U.S. at 322.

8   Plaintiffs' Motion fails to point to a piece of evidence clearly establishing that SAMCO

9   employed Plaintiffs, and not merely H-2A workers, during the relevant seasons.   As

10  Plaintiffs' Motion fails to cite such evidence, summary judgment is inappropriate even if

11  something hidden in the record might have supported Plaintiffs' claims. *See Keenan v. Allan*,

12  91 F.3d 1275, 1279 (9th Cir. 1996) (requiring that parties identify evidence with "reasonable

13  particularity" because courts are not obligated to "scour the record" to make a determination

14  at the summary judgment stage) (internal quotations omitted).  Even upon the Court's own

15  review of Plaintiffs' Statement of Facts and accompanying documents, the record appears

16  to lack evidence clearly establishing that SAMCO employed Plaintiffs during the relevant

17  seasons.  Although the record contains evidence suggesting that SAMCO had employees of

18  some type and that SAMCO had some connection to Marlin and SAMI, the Court is unaware

19  of any admissible evidence clearly delineating what type of employees SAMCO employed

20  at what times.

21         The Court likewise cannot grant summary judgment based on an argument that

22  SAMCO, even if it had no employees of its own, was nonetheless a joint employer by virtue

23  of its relationship with SAMI.  Defendants have presented evidence sufficient to create an

24  issue of fact as to whether SAMCO exercised sufficient control and influence over SAMI to

25  be considered a joint employer.  Richard De Leon's affidavit states,  "SAMCO had no

26  authority to control the harvest schedule of SAMI, determine the number of workers needed

27  by SAMI for harvesting, decide which days were suitable for harvesting by SAMI, inspect

28  work performed by SAMI workers, ensure that SAMI workers performed satisfactorily, or

1  the right to hire, fire or modify the working conditions of SAMI workers." Doc. 199, Ex. 1.

2  The first five factors of the economic reality test, therefore, suggest that SAMCO was a not

3  joint employer solely by virtue of its relationship with SAMI. *See Moreau*, 356 F.3d at

4  946–48 (stating that several factors to consider in determining joint employment are (1)

5  "[t]he nature and degree of control of the workers;" (2) "[t]he degree of supervision, direct

6  or indirect, of the work;" (3) "[t]he power to determine the pay rates or the methods of

7  payment of the workers;" (4) "[t]he right, directly or indirectly, to hire, fire, or modify the

8  employment conditions of the workers;" (5) "[p]reparation of payroll and the payment of

9  wages").[3]   The remaining factors of the economic reality test are less applicable in

10  determining the status of multiple labor contractors engaged by a given grower or employer,

11  especially where those labor contractors have engaged entirely separate groups of workers.

12  *See Moreau*, 356 F.3d at 952 (noting that some factors do not translate easily to particular

13  employment relationships). Given Defendants' evidence, the totality of the circumstances

14  require denial of summary judgment regarding whether SAMCO was a joint employer.

15  **III.   Fair Labor Standards Act**

16      The Fair Labor Standards Act prescribes standards for, among other topics, the

17  payment of a minimum wage for hours worked. *See generally* 29 U.S.C. § 201, *et seq.*

18  Plaintiffs seek a determination that the following were compensable hours worked under the

19  FLSA: (1) the hours spent at the beginning of each day waiting in the corralon (bus station)

20  until they received orders that the lemons were ready to be picked and that they could depart

21  for the fields; (2) the time spent traveling from the corralon to the fields; (3) after being

22  transported to the fields, the time spent waiting in the fields for permission to begin picking

23

24      [3]Plaintiffs respond to Richard De Leon's affidavit only by challenging it as overly
    conclusory.  Evidence produced at the summary judgment stage must be admissible and
25  based on personal knowledge, Fed. R. Civ. P. 56(e)(1), as well as more than "unsupported
26  conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107,
    1112 (9th Cir. 2003).  Given the context of the affidavit and Richard De Leon's position
27  within SAMI, this statement is more than a conclusory assertion.  The affidavit also
28  highlights specific facts relating to SAMI and the degree of control that SAMCO exercised.

1    lemons; and (4) the time spent being transported from one field to another during the
2    workday.

3         Defendants do not dispute that the latter two situations constitute compensable time
4    worked under the FLSA.  *See* 29 C.F.R. § 785.38 ("Time spent by an employee in travel as
5    part of his principal activity, such as travel from job site to job site during the workday, must
6    be counted as hours worked. Where an employee is required to report at a meeting place to
7    receive instructions or to perform other work there, or to pick up and to carry tools, the travel
8    from the designated place to the work place is part of the day's work, and must be counted
9    as hours worked regardless of contract, custom, or practice."); *Gonzalez v. Tanimura &*
10   *Antle, Inc.*, 2008 WL 4446536, at *12 (D. Ariz. Sept. 30, 2008) (holding that the time spent
11   waiting in the fields for permission to begin harvesting was compensable under the FLSA
12   because the workers were unable to perform personal activities).  The parties do dispute,
13   however, whether the time spent waiting in the corralon and traveling from the corralon to
14   the fields is compensable.

15        **A.    Waiting Time at the Corralon**

16        The FLSA requires that employers pay employees the federal minimum wage for time
17   spent "engaged in commerce or in the production of goods for commerce, or [] employed in
18   an enterprise engaged in commerce or in the production of goods for commerce." 29 U.S.C.
19   § 206(a).  An employee's waiting time is compensable if the employee was "'engaged to
20   wait,'" but not if the employee was "'wait[ing] to be engaged.'" *Owens v. Local No. 169,*
21   *Ass'n of W. Pulp & Paper Workers*, 971 F.2d 347, 350 (9th Cir. 1992) (citing *Skidmore v.*
22   *Swift & Co.*, 323 U.S. 134, 137 (1944)).  In other words, an employee's waiting time is
23   compensable if he or she is "unable to use the time effectively for his [or her] own purposes."
24   29 C.F.R. § 785.15.  This is a fact-intensive analysis, as it is difficult to "'lay down a legal
25   formula to resolve cases so varied in their facts.'" *Brigham v. Eugene Water & Elec. Bd.*, 357
26   F.3d 931, 935 (9th Cir. 2004) (*quoting Skidmore*, 323 U.S. at 136)).  "'[F]acts may show that
27   the employee was 'engaged to wait,' which is compensable, or they may show that the
28   employee 'waited to be engaged,' which is not compensable.'" *Id.* (quoting *Owens*, 971 F.2d

at 350 (quoting *Skidmore*, 323 U.S. at 137)); *see also Birdwell v. City of Gladsden, Ala.*, 970 F.2d 802, 808 (11th Cir. 1992) ("Certain sets of facts, if found by a fact finder, will give rise to liability under the FLSA while other sets of facts will not.  It is for the court to determine if a set of facts gives rise to liability; it is for the jury to determine if those facts exist."  In evaluating the facts, two critical factors are to be considered: "'(1) the degree to which the employee is free to engage in personal activities; and (2) the agreements between the parties.'" *Berry v. County of Sonoma*, 30 F.3d 1174, 1180 (9th Cir. 1994) (quoting *Owens*, 971 F.2d at 350).

### 1.    Degree of freedom to engage in personal activities

With respect to the first factor, the Ninth Circuit has enumerated an illustrative list of factors relevant to determining the degree to which an employee is free to engage in personal activities:

> (1) whether there was an on-premises living requirement; (2) whether there were excessive geographical restrictions on employee's movements; (3) whether the frequency of calls was unduly restrictive; (4) whether a fixed time limit for response was unduly restrictive; (5) whether the on-call employee could easily trade on-call responsibilities; (6) whether the use of a pager could ease restrictions; and (7) whether the employee had actually engaged in personal activities during call-in time.

*Owens*, 971 F.2d at 351.  Not all of these factors translate directly to the parties' employment relationship, but the factors on the whole weigh in Plaintiffs' favor.

*Gonzalez v. Tanimura & Antle, Inc.* addressed a group of plaintiffs who, like Plaintiffs in the present case, worked as harvesters and voluntarily rode their employers' bus to the harvesting fields each day.  2008 WL 4446536 (D. Ariz. Sept. 30, 2008).  On icy days, the vegetables would be unsuitable for picking in the morning, and the employees who took the bus were required to wait for the buses to arrive later in the day. *Id.* at *1–2.  The court reasoned that the plaintiffs lacked substantial freedom to engage in personal activities because they were required to stay near the bus stop or else they might miss the buses and thus a day's wages; while the plaintiffs could visit stores and perform other "time-filling" activities near the bus stop, they could not do many of the activities they would normally be able to do near their home communities. *Id.* at *12.

Likewise, Plaintiffs in this case offer evidence that they were, as a practical matter, required to stay geographically near the bus stop and were unable to use their time effectively for their own purposes. While Plaintiffs were able to frequent food vendors, stores, and other facilities within the vicinity, these activities, as *Gonzalez* noted, are often simply "time-filling" activities. 2008 WL 4446536, at *12. Moreover, those Plaintiffs who chose to take the bus were required to arrive at the corralon at a particular time each day. On days when the buses were late, Plaintiffs could not readily leave the area or otherwise avoid their waiting time because no one knew what time the buses would be ready to depart for the fields. Neither present any evidence that Plaintiffs had an alternative method of discovering what time the buses would depart or at what time and location they should report to the fields, therefore limiting the requirement that they wait for the bus while unable to perform other activities. To be sure, Defendants assert that Plaintiffs here, like the plaintiffs in *Gonzalez*, technically were not ordered to take the bus. 2008 WL 4446536, at *12. Nevertheless, those Plaintiffs who followed Defendants' strong recommendation and took the bus were required to arrive at the corralon at a particular time and to wait there without a realistic option for leaving until the buses arrived, even if the buses did not arrive at the scheduled time. The *Owens* factors suggest that Plaintiffs lacked extensive freedom to engage in personal activities on days when the buses were late.

## 2.    Agreements between the parties

Determining the degree of freedom, however, does not end the Court's analysis. The other "predominant factor[]" is the agreements between the parties. *Berry*, 30 F.3d at 1180 (citing *Owens*, 971 F.2d at 350). In analyzing the agreements between the parties, courts examine, for example, the "construction of the agreements between the particular parties, . . . their practical construction of the working agreement by conduct, [and] consideration of the nature of the service." *Skidmore*, 323 U.S. at 137. In this context, the Ninth Circuit has recognized three different types of agreements between employers and employees. *Berry*, 30 F.3d at 1180. Defendants argue that only one type of agreement, a constructive agreement,

1    is relevant in this case.[4]   "A constructive agreement may arise if employees have been
2    informed of the . . . compensation policy and continue to work under the disclosed terms of
3    the policy." *Id.* (citing *Owens*, 971 F.2d at 354–55).

4          Here, an issue of fact exists as to whether the parties had a constructive agreement
5    regarding the compensation of wait time.  Plaintiffs provide evidence that they frequently had
6    to wait at the corral on without pay, a practice not required by their previous employers.
7    These facts, however, do not negate the possibility that the parties nonetheless had a
8    constructive agreement not to compensate wait time at the corral on.  Defendants present
9    Richard De Leon's affidavit, which indicates that neither SAMI nor other harvesting
10   companies paid or agreed to pay farm workers for wait time at bus stops.  This affidavit
11   further provides that "workers were informed" of the hourly and piece rates and that,
12   "[c]onsistent with . . . long-standing custom and practice[,] . . . [w]orkers were not paid for
13   time spent waiting at the bus stop or traveling to the groves and . . . were never informed
14   otherwise by any representative of SAMI." (Doc. 199, Ex. 1).  Richard De Leon further avers
15   that he never received notice that any employee ever complained about the lack of
16   compensation for wait times.  Several issues, therefore, remain unresolved: whether the
17   parties understood that certain time was not compensable; whether each employee was
18   informed of the alleged policy; whether Plaintiffs complained about the alleged policy, and
19   whether Plaintiffs continued to work in acceptance of the alleged policy.

20         The lack of clarity regarding the parties' agreements makes summary judgment
21   inappropriate regarding the compensability of wait time at the corral on.  "The significance
22   and importance of evaluating the agreements between the parties is that the existence of such
23   agreements assists the trier of fact in determining whether the parties characterized the time
24   spent waiting on-call as actual work." *Berry*, 30 F.3d at 1180–81.  While the parties'

25   _____

26         [4] The other two main agreement types are an actual agreement pursuant to a collective
27   bargaining agreement and an express agreement based on employees voluntarily becoming
     employed after a compensation policy has been implemented. *Berry*, 30 F.3d at 1180 (citing
28   *Owens*, 971 F.2d at 355).

1   agreements are less relevant where there is "no uncertainty that the uncompensated time at

2   issue . . . was actually work," *id.* (citing *Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No.*

3   *123*, 321 U.S. 590, 602–04 (1944)), the existence of a constructive agreement would be

4   highly relevant here because there remains at least some uncertainty regarding Plaintiffs'

5   freedom to engage in personal activities.  Therefore, the fact that the *Owens* factors weigh

6   in Plaintiffs' favor does not compel the Court to ignore the possibility that a reasonable jury

7   could find, when considering the possibility of a constructive agreement, that certain wait

8   times were not compensable.  As such an agreement would be highly relevant, the Court

9   finds the issue more properly submitted to a jury.[5]

10                  **B.      Travel Time From the Corralon to the Fields**

11          Plaintiffs seek compensation for the time spent traveling from the corralon to the

12   fields on days where they were required to wait in the corralon until the fields were ready to

13   be harvested.  Plaintiffs explicitly do not seek compensation for travel time on days when

14   they voluntarily arrived at the corralon and were immediately bused to the fields, as such

15   time likely would not be compensable. *See* 29 U.S.C. § 254(a) (stating that the following

16   activities are not compensable: "(1) walking, riding, or traveling to and from the actual place

17   of performance of the principal activity or activities which such employee is employed to

18   perform, and (2) activities which are preliminary to or postliminary to said principal activity

19   or activities"); 29 C.F.R. § 785.35 ("An employee who travels from home before his [or her]

20   regular workday and returns to his [or her] home at the end of the workday is engaged in

21   ordinary home to work travel which is a normal incident of employment. This is true whether

22   he [she] works at a fixed location or at different job sites. Normal travel from home to

23   work is not worktime.").

24   _____

25          [5] *Gonzalez*, which concluded that wait time at a bus stop was compensable, does not
     dictate a contrary result. 2008 WL 4446536, at *9–13.  The court in *Gonzalez* was able to
26   discern that no implied agreement existed. *Id.* at * 11.  The facts there indicated that the
     plaintiffs were required to report to the bus stop at a particular time and were not made aware
27   of any policy regarding the compensation of wait time. *Id.*  The facts in the present case are
     not so crystallized, and summary judgment, therefore, is inappropriate.
28

1      Instead, Plaintiffs argue in their Response that their travel time should be compensated
2   *only* on days they were required to wait at the corralon for the lemons to be ready for harvest.
3   Plaintiffs assert that their travel time is compensable if it occurs within the confines of a
4   "continuous workday."   Plaintiffs cite 29 C.F.R. § 785.38, which states in pertinent part,
5   "Where an employee is required to report at a meeting place to receive instructions or to
6   perform other work there, or to pick up and to carry tools, the travel from the designated
7   place to the work place is part of the day's work, and must be counted as hours worked."
8   Plaintiffs contend that, on days the buses were delayed, their "workdays" began as soon as
9   they were required to wait at the corralon for their employers' benefit.   Thus, Plaintiffs
10  maintain that the travel time on the bus is compensable to the extent it took place within the
11  workday under 29 C.F.R. § 785.38.

12      The Court, however, need not decide at this point whether such travel time would be
13  compensable if it occurred after Plaintiffs waited at the corralon.   As the Court has explained,
14  an issue of fact exists as to whether the initial wait time at the bus stop was compensable
15  work time or noncompensable free time.   As a result, the Court cannot determine whether
16  Plaintiffs' waiting time began the "workday" and thus cannot hold, as a matter of law, that
17  any travel time from the bus stop to the fields occurred entirely within the bounds of the
18  workday pursuant to 29 C.F.R. § 785.38.   The Court, therefore, denies summary judgment
19  regarding travel time from the corralon to the fields.

20  **IV.   Migrant and Seasonal Agricultural Worker Protection Act**

21      AWPA provides various labor protections for migrant and seasonal agricultural
22  workers, including requirements that employers pay certain wages, keep accurate records,
23  avoid providing false or misleading information, and prevent disparate treatment of United
24  States agricultural workers. *See generally* 29 U.S.C. § 1801 *et seq.*   Plaintiffs argue that
25  Defendants violated AWPA in four ways: (1) by failing to pay wages owed when due in
26  violation of 29 U.S.C. § 1832(a), (2) by failing to make, keep, and preserve records of the
27  hours spent waiting at various times in violation of § 1831(c), (3) by knowingly providing
28  false or misleading information to Plaintiffs in violation of § 1831(e), and (4) by giving

1    preferential treatment to alien workers in violation of their working arrangement and §
2    1832(c).

3        **A.    Failure To Pay Wages Owed When Due**

4        29 U.S.C. § 1832(a) provides, "Each farm labor contractor, agricultural employer, and
5    agricultural association which employs any seasonal agricultural worker shall pay the wages
6    owed to such worker when due." Plaintiffs argue that, to the extent the FLSA requires wages
7    to be paid, Defendants are likewise liable under Section 1832(a) for failure to pay "wages
8    owed." A violation of Section 1832(a) occurs when wages are due under either federal or
9    state wage and hour laws. *Doe v. D.M. Camp & Sons*, 624 F. Supp.2d 1153, 1168 (E.D. Cal.
10   2008) ("Wages may be defined by federal, state, and local laws. Failure by an employer to
11   pay those wages constitute[s] violations of AWPA."); *see also Medrano v. D'Arrigo Bros.*
12   *Co. of Cal.*, 125 F. Supp.2d 1163, 1166–67 (N.D. Cal. 2000) (noting that Section 1832(a)
13   "simply provides that wages must be paid when due, without limiting the source of the
14   obligation"). Specifically, a "finding of liability on [P]laintiffs' FLSA claims *ipso facto* leads
15   to the conclusion" that Defendants also violated AWPA. *See Smith v. Bonds*, 1993 WL
16   556781, at *8 (E.D. N.C. Sept. 28, 1993) (addressing liability under 29 U.S.C. § 1822, which
17   also requires that employers "shall pay the wages owed to [migrant agricultural workers]
18   when due"). Therefore, to the extent Plaintiffs can prove at trial that certain wages were
19   owed under state or federal law, Plaintiffs may establish that Defendants violated AWPA.

20       Defendants next argue that, while damages may be available under 29 U.S.C. §
21   1854(c), "multiple recoveries based upon multiple statutory theories should not be
22   countenanced." (Doc. 198 at 10). As Defendants offer no legal or factual basis for this
23   argument, the Court need not deny summary judgment on AWPA on this ground alone.
24   Nonetheless, the Court notes that, at least in certain circumstances, statutory damages under
25   § 1854(c) may be available even where actual damages are recoverable under other statutes
26   without constituting "double recovery." *See Martinez v. Shinn*, 992 F.2d 997, 1001 (9th Cir.
27   1993) (affirming award of damages for unpaid back pay under state law and statutory

28

1    damages under AWPA for failure to pay wages when due because the two awards were based

2    on different compensation theories).

3         **B.    Failure To Make, Keep, and Preserve Records**

4         AWPA requires employers to "make, keep, and preserve records for three years of . . .

5    the number of piecework units earned, if paid on a piecework basis[,] [and] the number of

6    hours worked" by each worker. 29 U.S.C. § 1831(c)(1)(B)–(C).  Plaintiffs contend that

7    Defendants violated this section by failing to record Plaintiffs' wait time at the corralon and

8    by inaccurately accounting for the variation in the number of hours worked.

9         With respect the recording of wait time at the corralon, Defendants do not appear to

10   dispute that they neglected to record the time Plaintiffs spent waiting for the buses to arrive.

11   Nonetheless, if the wait time at the corralon was not compensable, then Defendants could not

12   have violated AWPA by failing to record such time.  Accordingly, because the Court finds

13   an issue of material fact regarding whether the wait time at the corralon is compensable, the

14   Court likewise denies summary judgment regarding Defendants' failure to record such time

15   under AWPA.

16        Regarding the other alleged inaccuracies, Plaintiffs offer evidence indicating that

17   Defendants evaded record-keeping requirements.  This theory is based largely on allegations

18   that Defendants' records include wide variation in the number of hours worked by

19   employees.   Nonetheless, Defendants correctly argue that damages under AWPA are

20   inappropriate because, even if they violated record-keeping provisions of 29 U.S.C. § 1831,

21   "[o]nly 'intentional' violations of the []AWPA subject a defendant to liability for damages."

22   *Rodriguez v. Carlson*, 943 F. Supp. 1263, 1271 (E.D. Wash. 1996) (citing 29 U.S.C.

23   § 1854(c)).  "Intentional" in this context is a "conscious and deliberate violation of the Act."

24   *Id.* (citing *Bueno v. Mattner*, 829 F.2d 1380, 1385–86 (6th Cir. 1987)); *see also Alvarez v.*

25   *Longboy*, 697 F.2d 1333, 1338 (9th Cir. 1983) (defining "intentional" for purposes of the

26   Farm Labor Contractors Registration Act, the predecessor of AWPA, as "conscious or

27   deliberate").  At the same time, a plaintiff need not prove "specific intent by defendants to

28   violate the []AWPA," as the "intentional" requirement "has been construed liberally to

impose liability on individuals for the natural consequences of their acts." *Rodriguez*, 943 F. Supp. at 1271 (citing *Bueno*, 829 F.2d at 1386 (citing *Rivera v. Adams Packing Ass'n*, 707 F.2d 1278, 1283 (11th Cir. 1983))). For instance, a recording violation is generally intentional if the error is made by, or at the direction of, management personnel who have knowledge of the mistakes in the records. *See Wales v. Jack M. Berry, Inc.*, 192 F. Supp.2d 1269, 1288 (M.D. Fla. 1999) (holding that the failure to keep accurate records was intentional insofar as it resulted from changes deliberately made by management, but was unintentional to the extent the errors did not result from management's instructions).

Defendants have presented evidence creating an issue of fact as to whether Defendants acted intentionally. Richard De Leon's affidavit asserts that he was unaware of any falsification of employment records and that neither he, nor any of his agents, instructed that any records be falsified. Like the defendants in *Wales*, 192 F. Supp.2d at 1288, Defendants here would not be liable if they did not direct anyone to create inaccurate records and if they were unaware of any alleged inaccuracies. Richard De Leon further explains that SAMI lacked any incentive to under-report hours worked because to do so would reduce the amount paid to SAMI by Marlin Growers. Because Marlin Growers paid SAMI based on the work SAMI reported that its employees performed, a reasonable jury could find that SAMI lacked any incentive to intentionally under-report employees' hours. Although, as Plaintiffs suggest, an insidious motive also could be contemplated from these facts, such matters are inappropriate for resolution on summary judgment. *See Anderson*, 477 U.S. at 248 (explaining that credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences are jury functions). Therefore, even if, as Defendants acknowledge, some variation in the records might have existed, an issue of fact exists as to whether Defendants consciously and deliberately violated the Act.

## C.   Knowingly Providing False or Misleading Information

29 U.S.C. § 1831(e) prohibits an agricultural employer from "knowingly provid[ing] false or misleading information to any seasonal agricultural worker concerning the terms, conditions, or existence of agricultural employment required to be disclosed by [§

1831(a)–(c)].  To be sure, a claim under this subsection may be based on the alleged under-reporting of hours on Plaintiffs' wage statements. *Sanchez-Calderon v. Moorhouse Farms*, 995 F. Supp. 1098, 1105 (D. Or. 1997) (analyzing a similar provision under 29 U.S.C. § 1821(f)).  Nonetheless, the Court has already determined that an issue of fact exists regarding whether Defendants knowingly and/or intentionally misstated Plaintiffs' hours.  For the same reason, summary judgment is inappropriate on the Section 1831(e) claim.

**D.    Giving Preferential Treatment to Alien Workers**

Plaintiffs argue that Defendants violated 29 U.S.C. § 1832(c) by giving preferential treatment to alien workers, which Plaintiffs contend violated the "working arrangement," or employment contract, between Defendants and Plaintiffs.  Plaintiffs allege that Defendants employed both Plaintiffs and temporary foreign labor under the H-2A program and that Defendants failed to offer Plaintiffs the same employment terms and wages as were offered to the foreign laborers.  Specifically, Plaintiffs contend Defendants offered H-2A workers, but did not offer Plaintiffs, higher per-hour wages, free housing, and written contracts of employment.

Section 1832(c) provides, "No farm labor contractor, agricultural employer, or agricultural association shall, without justification, violate the terms of any working arrangement made by that contractor, employer, or association with any seasonal agricultural worker."  29 U.S.C. § 1832(c).  Plaintiffs do not argue that some specific working arrangement between the parties explicitly prohibited preferential treatment of alien workers.  Instead, Plaintiffs argue that their "working arrangement" with Defendants necessarily incorporated applicable federal labor law, including 20 C.F.R. § 655.102(a) (2010).[6]  At the time the Motion was filed, Section 655.102(a) provided in pertinent part, "The employer's job offer to U.S. workers shall offer the U.S. workers no less than the same benefits, wages, and working conditions which the employer is offering, intends to offer, or will provide to

---

[6] 20 C.F.R. §655.102 has since been amended, but the Court considers the prior version of this Section for purposes of this Motion.  All future citations in this regulation are to this edition.

1    H-2A workers." 20 C.F.R. § 655.102(a).

2           As a preliminary matter, summary judgment is inappropriate as against SAMCO.  As
3    discussed *supra* Section I, an issue of fact exists as to whether SAMCO employed any
4    Plaintiffs.  If SAMCO did not employ Plaintiffs, no claim for disparate treatment under §
5    655.102(a) exists.

6           Summary judgment likewise is appropriate as against the remaining Defendants
7    because the requirements of 20 C.F.R. § 655.102(a) are not necessarily incorporated into the
8    parties' working arrangement.  Multiple district courts within the Ninth Circuit have held that
9    the "working arrangement" discussed in AWPA does not automatically incorporate other
10   labor laws.  *Doe v. D.M. Camp & Sons*, 624 F. Supp.2d 1153, 1169 (E.D. Cal. 2008)
11   (explaining that a working arrangement includes only those terms communicated between
12   the parties); *Valenzuela v. Giumarra Vineyards Corp.*, 619 F. Supp.2d 985, 990 (E.D. Cal.
13   2008) (holding that "working arrangements should be understood as the contract terms
14   between the employer and employee") (citing *Barajas v. Bermudez*, 43 F.3d 1251, 1257 (9th
15   Cir. 1994)); *Robles v. Sunview Vineyards of Cal., Inc.*, 2008 WL 895945, at *6 (E.D. Cal.
16   Mar. 31, 2008) (holding that, because Congress intended that "working arrangements [be]
17   created in the interaction between" the employer and the employee, "a working arrangement
18   under AWPA constitutes the terms of employment communicated between employer and
19   employee[] [and] does not automatically encompass any and all statutes and regulations
20   governing agricultural employment"); *see also Sanchez v. Overmyer*, 845 F. Supp. 1183,
21   1187 n. 3 (N.D. Ohio 1993) (holding that, while the term "wage" incorporated requirements
22   under the Federal Insurance Contributions Act, a "working arrangement" referred to the
23   "express terms of a working arrangement as opposed to those implied by law").  Hence, a
24   working arrangement includes only those terms that are communicated to the employer. *See*
25   *Valenzuela*, 619 F. Supp.2d at 990; *Doe*, 624 F. Supp.2d at 1169; *Robles*, 2008 WL 895945,
26   at *6; *Sanchez*, 845 F. Supp. at 1187.  A few out-of-circuit cases have concluded that a
27   working arrangement may impliedly include statutory requirements. *See, e.g.*, *Aviles v.*
28   *Kunkle*, 765 F. Supp. 358, 366 (S.D. Tex. 1991).

1   Nonetheless, the Court is reluctant to conclude at the summary judgment stage that

2   the parties' working arrangement *necessarily* incorporates 20 C.F.R. § 655.102(a).  To be

3   sure, the communication of terms required in a working arrangement "need not necessarily

4   be verbal or in writing[,]" as "an accepted custom or practice that the employer enforces and

5   the employee follows can also qualify as an implicitly communicated term." *Valenzuela*, 619

6   F. Supp.2d at 993 (citing *Colon v. Casco, Inc.*, 716 F. Supp. 688, 690 (D. Mass. 1989)).  But

7   Plaintiffs have offered no legal or factual argument that the disparate-impact requirements

8   of 20 C.F.R. § 655.102(a) were communicated to Plaintiffs, either explicitly or implicitly,

9   sufficient to incorporate those requirements into the working arrangement.[7]  Accordingly,

10  Plaintiffs' Motion regarding its claim under 29 U.S.C. § 1832(c) is denied.

11  **V.   California Wage Laws**

12  On some days, Plaintiffs worked for Defendants in California, rather than in Arizona.

13  With respect to those days, Plaintiffs contend that Defendants violated Section 203 of the

14  California Labor Code and California Industrial Welfare Commission Wage Order No. 14-80

15  ("Wage Order No. 14-80"), which is codified at Cal. Code Regs., tit. 8, § 11140.

16  Specifically, Plaintiffs allege that Defendants failed to record and to compensate time spent

17  traveling to and from the fields and time spent waiting in the corralon and in the fields.

18  **A.   Waiting and Travel Time**

19  While California's wage laws include many of the same protections as do federal

20  labor laws, interpretation of the California statutory scheme does not necessarily mirror that

21  of the federal scheme. *Morillion v. Royal Packing Co.*, 22 Cal.4th 575, 588, 995 P.2d 139

22  (2000).   "Wage Order No. 14-80 requires an agricultural employer to pay agricultural

23  workers a specified minimum wage for 'all hours worked.'" *Medrano v. D'Arrigo Bros. Co.*

24  *of Cal.*, 336 F. Supp.2d 1053, 1057 (N.D. Cal. 2004) (citing 8 Cal. Code. Regs. tit. 8, §

25  11140(4)); *Morillion v. Royal Packing Co.*, 22 Cal.4th 575, 587 (2000)). "Hours worked" is

26

27      [7] Plaintiffs appear to make a similar argument that Defendants violated a working
    arrangement by failing to pay wages owed when due under 29 U.S.C. § 1832(a).  For the

28  same reasons set forth above, this argument fails.

defined as "the time during which an employee is subject to the control of an employer, []

includ[ing] all the time the employee is suffered or permitted to work, whether or not

required to do so." Cal. Code. Regs. tit. 8, § 11140(2)(G).

Compensable non-production time generally includes the following: (1) compulsory travel time, (2) time spent waiting at a departure point, such as a corralon, and (3) time spent waiting in the fields. *See Gonzalez*, 2008 WL 4446536, at *17 (awarding summary judgment in plaintiffs' favor because the "[p]laintiffs were under [d]efendant's control during the time [p]laintiffs[] spent in or near [d]efendant's parking lot and in the field waiting" to be able to begin harvesting); *Medrano*, 336 F. Supp.2d at 1057 ("[A]ll time that agricultural workers spend under the employer's control—including specifically compulsory travel and waiting time—must be considered 'hours worked' pursuant to Wage Order No. 14-80."); *Morillion*, 22 Cal.4th at 594 ("[C]ompulsory travel time is compensable as 'hours worked.'"). To the extent Plaintiffs can produce evidence that they waited in the fields in California for the lemons to be ready for harvesting, Defendants do not dispute that such time is compensable. Defendants further do not dispute that, to the extent travel time within California was compulsory, it is compensable.[8]

Defendants, however, argue that travel and wait time are compensable *only* to the extent these activities took place within California. It is undisputed that the wait time at the corralon in San Luis necessarily took place outside of California and that all but approximately eight miles of travel per trip occurred outside of California.

---

[8] Although California law makes clear that "compulsory travel time" is compensable, California courts have noted that optional travel time is not compensable. *See Morillion*, 22 Cal.4th at 594 (noting that "employers may provide optional free transportation to employees without having to pay them for their travel time, as long as employers do not require employees to use this transportation"); *Overton v. Walt Disney Co.*, 38 Cal. Rptr.3d 693, 699 (Ct. App. 2006) (concluding that time spent on an optional company shuttle was not compensable). *But see Gonzalez*, 2008 WL 4446536, at *17 (holding that time spent waiting for an optional bus was compensable to the extent plaintiffs were under the defendant's control).

The extent to which the California Labor Code and the accompanying Wage Orders apply to work performed outside of California is not clearly established.  The California Supreme Court has explained that "California employment laws implicitly extend to employment occurring within California's state law boundaries." *Tidewater Marine W., Inc. v. Bradshaw*, 927 P.2d 296, 301 (Cal. 1996).  The court in *Tidewater* went on to hold that California's wage laws apply to employees who reside in California, receive pay in California, and work in California.  *Id.* at 309 ("If an employee resides in California, receives pay in California, and works exclusively, or principally, in California, then that employee is a 'wage earner of California' and presumptively enjoys the protection of IWC regulations."); *see also United Air Lines, Inc. v. Indus. Welfare Comm'n*, 28 Cal. Rptr. 238, 248–49 (Ct. App. 1963) (explaining that IWC regulations apply to persons who are domiciled in California but work principally outside the state); *The 2002 Update of the DLSE Enforcement Policies and Interpretations Manual (Revised)* ("Absent a conflict with federal law, and subject to proper interpretation of the IWC Orders in light of the existence of territorial boundaries and potential conflicts with the laws of other jurisdictions, the IWC Orders presumptively cover individuals who are domiciled in California but who work partly or, under some circumstances, even principally, outside the state.").

*Tidewater* left unsettled the issue of the extent to which California wage laws apply to non-residents for the limited time spent working in California.  The court in *Tidewater* explained that it was "not prepared . . . to hold that IWC wage orders apply to *all* employment in California." 927 P.2d at 309.  For instance, the court speculated that the Legislature may have intended extraterritorial enforcement of wage orders when "California residents working for a California employer travel temporarily outside the state during the course of the normal workday but return to California at the end of the day," while "the Legislature may not have intended IWC wage orders to govern out-of-state businesses employing nonresidents, though the nonresident employees enter California temporarily during the course of the workday." *Id.*

1    Nonetheless, according to *Tidewater*, "California's territorial boundaries are relevant

2  to determining whether IWC wage orders apply." *Id.*  Other courts have similarly concluded

3  that the place where the work takes place is the critical issue. *See Sarviss v. Gen. Dynamics*

4  *Info. Tech., Inc.*, 663 F. Supp.2d 883, 900 (C.D. Cal. 2009) (focusing on the "situs of

5  employment as opposed to residence of the employee or the employer" and holding that work

6  performed outside of California by a California resident was not covered by California wage

7  laws); *Priyanto v. M/S Amsterdam*, 2009 WL 175739, at *6–8 (C.D. Cal. Jan. 23, 2009)

8  (holding that California wage laws did not apply where plaintiffs were unable to show that

9  they worked in California); *cf. Tidenberg v. Bidz.com, Inc.*, 2009 WL 605249, at *4 (C.D.

10  Cal. Mar. 4, 2009) (explaining that California's Unfair Competition Law and False

11  Advertising Law apply to "unlawful conduct [that] took place in California" because "state

12  statutory remedies may be invoked by out-of-state parties when they are harmed by wrongful

13  conduct occurring in California"); *Guillory v. Princess Cruise Lines, Ltd.*, 2007 WL 102851,

14  at *2–5 (Cal. Ct. App. Jan 17, 2007) (holding that the California Fair Employment and

15  Housing Act did not apply because no part of the appellant's employment was performed in

16  California); *Peikin v. Kimmel & Silverman, P.C.*, 576 F. Supp.2d 654, (D. N.J. 2008)

17  (concluding that New Jersey's employment-discrimination law did not protect a non-resident

18  from discriminatory acts undertaken in Pennsylvania even though the employee sometimes

19  conducted business in New Jersey).

20    In this case, while the parties do not dispute that California wage laws apply to work

21  performed in California, Plaintiffs offer no persuasive argument that time spent waiting or

22  traveling in Arizona is compensable under California law.  The only authority Plaintiffs cite

23  to this effect is *Sullivan v. Oracle Corp.*, 557 F.3d 979 (9th Cir. 2009).  *Sullivan*, however,

24  made no holding on the applicability of California wage laws to out-of-state work, but

25  instead certified to the California Supreme Court three questions regarding the applicability

26  of California's Unfair Competition Law to overtime work performed both inside and outside

27  of California.  Even assuming the California Supreme Court's pending decision regarding

28  the territorial scope of California's Unfair Competition Law would effect the scope of its

wage laws, the certification in *Sullivan* stands at most for the proposition that California law remains unclear, but does not suggest that work performed outside of California would be compensable in the present case.  Therefore, while Defendants violated California's wage laws to the extent Plaintiffs can prove at trial that they performed compensable but unpaid wait and/or travel time within California, the Court denies summary judgment regarding the time spent waiting and traveling outside of California.

### B.    "Willful" Violation of Cal. Lab. Code § 203

To the extent travel and wait time is compensable under California law, Plaintiffs further seek summary judgment that Defendants incurred statutory penalties under Section 203 of the California Labor Code.  Section 203(a) provides in pertinent part:

> If an employer willfully fails to pay, without abatement or reduction, in accordance with Section[] 201 . . . any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days.

Cal. Lab. Code § 203(a).[9]

Although Defendants do not dispute that statutory penalties may be available for the willful failure to pay wages, Defendants argue that any failure was not made "willfully," as required by Section 203(a).  "'[W]illful' merely means that the employer intentionally failed or refused to perform an act which was required to be done[,]" and does not require a "deliberate evil purpose." *Armenta v. Osmose, Inc.*, 37 Cal. Rptr.3d 460, 469 (Ct. App. 2005) (internal quotations omitted).  However, a "'good faith dispute' that any wages are due will preclude imposition of waiting time penalties.'" *Campbell v. PricewaterhouseCoopers, LLP*, 602 F. Supp.2d 1163, 1185 (E.D. Cal. 2009) (quoting Cal. Code Regs. tit 8, § 13520).

To the extent Plaintiffs can prove at trial that they performed travel and wait time in California and that Defendants intentionally refused to compensate them for that time, then Defendants' conduct was willful.  Although Defendants may not have had a "deliberate evil

---

[9] Section 201(a) of Labor Code states in pertinent part, "If an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately." Cal. Lab. Code § 201(a).

purpose," Plaintiffs will have to prove only that Defendants "intentionally failed or refused to" pay wages for work performed in California—an act that Defendants concede "was required to be done." *See Armenta*, 37 Cal. Rptr.3d at 469.  Although the Court denies summary judgment because underlying questions of fact relate to whether Plaintiffs can prove these elements, the Court rejects any suggestion that Plaintiffs must prove any evil purpose or specific intent to violate a statute.

On the other hand, with respect to work performed outside of California, summary judgment in Plaintiffs' favor is inappropriate.  As the Court has already explained, California wage law does not necessarily apply to work performed outside of California.  Accordingly, Defendants would have had a "good faith dispute" as to whether any such wages were owed. *See Campbell*, 602 F. Supp.2d at 1185; *see also Cervantez v. Celestica Corp.*, 618 F. Supp.2d 1208, 1221 (C.D. Cal. 2009) (holding that employers did not commit a willful violation to pay wages under Section 203 of the California Labor Code because plaintiffs had not presented evidence of a violation at all).

## C.    Record-keeping Under Cal. Lab. Code § 204.3(f)

Plaintiffs contend that Defendants violated the record-keeping provisions of Section 204.3(f) of the California Labor Code.  That section provides, "Every employer shall keep records that accurately reflect compensating time earned and used." Cal. Lab. Code § 204.3. Although Defendants may have failed to keep certain records, Plaintiffs fail to explain the applicability of Section 204.3.  First, Section 204.3 addresses compensating time off in lieu of overtime compensation. *Id.*  "[C]ompensating time" refers to "hours during which an employee is not working, which are not counted as hours worked during the applicable workweek or other work period for purposes of overtime compensation, and for which the employee is compensated at the employee's regular rate." *Id.* § 204.3(g).  Plaintiffs do not explain how compensating time is relevant to this case.  This statute further appears inapposite because it does "not apply to any employee who is subject to . . . [Wage Order No.] 14-80[,]" which clearly does apply to Plaintiffs. *Id.* § 204.3(I).  Finally, even if an

1  argument could be made that Section 204.3 is relevant to this case, the argument may have

2  been waived because Plaintiffs did not allege this argument in their Complaint.

3      **IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment

4  (Doc. 179) is **DENIED**.

5      **IT IS FURTHER ORDERED** that Plaintiffs' Motion for Summary Judgment (Doc.

6  181) is **GRANTED IN PART** and **DENIED IN PART**.

7      1.     Regarding joint employment, the Court holds that Marlin Growers, Marlin

8  Ranching, SAMI, and Richard De Leon are joint employers, but denies summary judgment

9  regarding the employer status of the remaining Defendants.

10     2.     Regarding the FLSA, to the extent Plaintiffs can prove at trial that they spent

11 time waiting in the fields and traveling from one field to another, that time is compensable.

12 With respect to waiting time at the corralon and travel time between the corralon and the

13 fields, summary judgment is denied.

14     3.     Regarding AWPA, to the extent Plaintiffs can prove at trial that Defendants

15 were required to pay wages under the FLSA or California wage laws, liability under AWPA

16 is established.  The Court denies summary judgment in all other respects.

17     4.     Regarding California wage laws, to the extent Plaintiffs can prove at trial that

18 they performed compensable wait and/or travel time in California, this constitutes a violation

19 of California wage laws.  And to the extent Plaintiffs can prove that Defendants willfully

20 committed these violations, statutory penalties under Cal. Lab. Code. § 203 are appropriate.

21 Summary judgment is denied in all other respects.

22     DATED this 20th day of September, 2010.

23

24  _____
                  G. Murray Snow
25              United States District Judge

26

27

28

- 30 -